**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SATOSHI NISHIHATA, *et al.*,<br><br>        Plaintiffs,<br><br>    v.<br><br>ANTONY BLINKEN, *et al.*,<br><br>        Defendants. | Civil Action No. 21-2173 (CKK) |

**MEMORANDUM OPINION**
(September 30, 2021)

Plaintiffs Satoshi Nishihata and Ayaka Nishihata are applicants for diversity visas for the fiscal year 2021 diversity visa program.[1] By statute, their eligibility to receive diversity visas expires on September 30, 2021. Plaintiffs have not yet been deemed "documentarily qualified," nor have they received consular interview appointments—both of which are prerequisites to obtaining a diversity visa. In light of the fast-approaching September 30, 2021 deadline, Plaintiffs filed an [9] Motion for a Temporary Restraining ("TRO") on September 27, 2021. Therein, Plaintiffs request an order compelling Defendants to reserve two diversity visas pending this litigation, past the statutory September 30, 2021 deadline.

Upon consideration of the pleadings,[2] the relevant legal authorities, and the record as a whole, the Court will **DENY** Plaintiffs' [9] Motion for a Temporary Restraining Order and will **HOLD IN ABEYANCE** Defendants' Motion to Dismiss.

---

[1] Plaintiff Chihito Omori filed a [8] Notice of Voluntary Dismissal on September 25, 2021.

[2] The Court's consideration has focused on the following:
- Plaintiffs' Motion for Temporary Restraining Order and Mandatory Injunction ("Pls.' TRO Mot.");
- Plaintiffs' Memorandum in Support of Motion for TRO and Relief Pursuant to 5 U.S.C. § 705 ("Pls.' TRO Mem."), ECF No. 10;
- Defendants' Memorandum of Points and Authorities in Support of Defendants' Cross-Motion to Dismiss and Opposition to Plaintiff's Motion for TRO and Mandatory Injunction ("Defs.' Opp'n"), ECF Nos. 13

## I.    BACKGROUND

### A.  The Diversity Visa Program

Under the Immigration and Nationality Act ("INA"), "Congress has provided for up to 55,000 immigrant diversity visas to be distributed each fiscal year to foreign nationals that hail from countries with historically low levels of immigration to the United States." *Filazapovich v. Dep't of State*, No. 21-cv-943 (APM), 2021 WL 4127726, at *2 (D.D.C. Sept. 9, 2021) (citing 8 U.S.C. §§ 1151(e), 1153(c)).  "Millions of hopefuls enter a lottery for the chance to apply for one of the 55,000 allotted diversity visas." *Id.* (citing *Gomez v. Trump* ("*Gomez I*"), 485 F. Supp. 3d 145, 159 (D.D.C. 2020)).  The winners of the lottery "submit an application and various documents to be eligible for a visa number," which can be used only during the fiscal year for which the selectee applied. *Almaqrami v. Pompeo*, 933 F.3d 774, 776–77 (D.C. Cir. 2019).

Once the selectee is assigned a visa number, he or she must submit required documents to the Kentucky Consular Center ("KCC"). *See* 9 FAM 502.6-4(d)(1).  The KCC then reviews the submitted materials for completion, and, upon deeming the applicant "documentarily qualified," schedules an interview at a local consular office for the applicant when [his or her] regional lottery rank number is "about to become current." 9 FAM 502.6-4(d)(2); *see also* 8 U.S.C. § 1202(b) ("All immigrant visa applications shall be reviewed and adjudicated by a consular officer.").  A visa interview is scheduled "only if the visa number for the applicant's country, region, and rank order is current per the information in the [State Department's] Visa Bulletin." *Gjoci v. Dep't of State*, Case No. 1:21-cv-00294-RCL, 2021 WL 3912143, at *2 (D.D.C. Sept. 1, 2021); *see also* FAM

---

       ■    Defendants' Memorandum of Points and Authorities in Support of Defendants' Opposition to Plaintiff's Motion for TRO and Mandatory Injunction ("Defs.' Suppl. Opp'n"), ECF No. 15; and
       ■    Reply to Defendants' Opposition to Plaintiffs' Motion for TRO and Relief Pursuant to 5 U.S.C. § 705 ("Pls.' Reply").
In an exercise of its discretion, the Court finds that holding oral argument in this action would not be of assistance in rendering a decision. *See* LCvR 7(f).

502.6-4(d)(2).  "And the availability of interview appointments may depend on the available resources and competing demands of consulates in an applicant's country of residence." *Gjoci*, 2021 WL 3912143, at *2.  Interviews for lottery selectees are "scheduled in order of their rank number." *Id.*; *see also* Defs.' Opp'n Ex. B, Declaration of Morgan Miles ("Miles Decl.") ¶ 6, ECF No. 12-3 ("KCC uses the rank number . . . to determine the order in which cases are eligible to be scheduled for appointments."); *id.* ("[Diversity visa] selectees with a low rank order, as reflected in their case number, are more likely to get the opportunity to interview, while those with higher numbers are less likely to be scheduled.").  Thereafter, "if [he or she] meets the criteria to obtain one, the State Department 'shall' issue [him or her] a diversity visa." *Almaqrami*, 933 F.3d at 777 (quoting 8 U.S.C. § 1153(c)).

"If the selectee does not receive a visa by the end of the fiscal year, however, he is out of luck[.]" *Gomez I*, 485 F. Supp. 3d at 159.  "Because the diversity visa program restarts each fiscal year, consular officers may not issue diversity visas after midnight on September 30 of the [fiscal year]." *Almaqrami*, 933 F.3d at 777.

Demand for diversity visas "regularly outstrips supply." *Gomez I*, 485 F. Supp. 3d at 159 (noting, for example, that "in Fiscal Year 2018, there were 14.7 million qualified entries"); *see also P.K. v. Tillerson*, 302 F. Supp. 3d 1, 3 (D.D.C. 2017) ("Millions of people enter the lottery every year.").  "Those selected for the [diversity visa] program are not guaranteed a visa—only the opportunity to apply for one." *P.K.*, 302 F. Supp. 3d at 3.

According to Defendants, 71,817 people were selected from the Fiscal Year 2021 Diversity Visa ("DV-2021") lottery, accounting for 137,969 diversity visa applicants (including selectees' spouses and children) seeking one of 54,850 available visas.  Miles Decl. ¶ 4.

**B.  Diversity Visa Processing During COVID-19 Pandemic**

Neither Plaintiffs' TRO Motion nor their Complaint raises any specific claim contesting Defendants' policies with respect to processing diversity visa petitions during the COVID-19 pandemic.  Nonetheless, the Court shall provide a brief summary of the policies relevant to the processing of applications for DV-2021 selectees.[3]

Beginning in March 2020, the State Department suspended routine visa processing services due to the COVID-19 pandemic, limiting embassies and consulates to processing visa cases deemed "emergency" or "mission critical."  Defs.' Opp'n Ex. A, Declaration of Francis Chris Lanning ("Lanning Decl.") ¶ 2, ECF No. 12-2.  Diversity visas were excluded from these definitions.  *Id.*

In April 2020, then-President Donald J. Trump issued Presidential Proclamation 10014, which temporarily suspended the entry of immigrants into the United States pursuant to 8 U.S.C. § 1182(f) and 8 U.S.C. § 1185(a). 85 Fed. Reg. 23,441 (Apr. 27, 2021).  This suspension was subsequently extended through March 31, 2021 by Presidential Proclamation 10052, 85 Fed. Reg. 38,263, 38,263–67 (June 25, 2020) and Presidential Proclamation 10131, 86 Fed. Reg. 417, 418 (Dec. 31, 2020).  Although these Proclamations provided certain exceptions in "the national interest" to the general suspension of immigrant entry, there was "no specific national interest exceptions available for diversity visa applicants[.]" *Gomez I*, 485 F. Supp. 3d at 162.  Defendants note that Presidential Proclamation 10014 never applied to Plaintiffs in this case because it was rescinded in February 2021, before their visa number became "current."  *See* Defs.' Opp'n at 7.  Plaintiffs do not dispute this point.

---

[3] More extensive discussions of the facts underlying the processing of diversity visas during FY2020 and FY2021 can be found in, *e.g.*, *Filazapovich*, 2021 WL 4127726, at *2–5; *Gjoci*, 2021 WL 3912143, at *1–5, and *Gomez I*, 485 F. Supp. 3d at 160–64.

The State Department interpreted these proclamations and associated guidance as "suspend[ing] not only entry but also the issuance of visas . . . not subject to one of the enumerated exceptions." *Id*. Accordingly, following the issuance of Presidential Proclamation 10014, the State Department instructed consular posts that they could adjudicate immigrant visas only "for applicants that [the] post believes may meet an exception to the [Presidential Proclamation], including the national interest exception, and that constitute a mission critical category." *Filazapovich*, 2021 WL 4127726, at *3.

On July 8, 2020, the State Department issued guidance that created a "phased approach" to the "resumption of routine visa services," which "laid out visa-processing priorities across three phases of resumed services." *Id*. Under this three-phase approach, diversity visas could not be processed until a consular post reached "Phase Three," and even then, the consular post could process visas only for selectees eligible for an exception under Proclamation 10014. *See id.*

The State Department issued new visa-processing guidance in November 2020, indicating that although its earlier July 2020 guidance "provides important context and structure," consular posts "are no longer obligated to be in a specific . . . phase to adjudicate a particular visa class as described in prior guidance." *Id*. The November 2020 guidance nonetheless "defaulted to a tiered and hierarchical approach that 'closely resembled" the earlier guidance. *Id.* (internal quotation marks and citation omitted). Pursuant to the November 2020 guidance, "[d]iversity visa processing . . . remained relegated to the lowest priority tier." *Id*. Defendants indicate that the November 2020 guidance "prioritized the processing of immediate relative and certain special immigrant visa cases" based on the State Department's "assessment of competing interests" including its "longstanding policy of facilitating family reunification[.]" Defs.' Opp'n at 5.

On February 19, 2021—after the transition of presidential administrations—the State Department issued revised guidance on "Scheduling and Prioritizing Immigrant Visas and Diversity Visa Cases." *See* Lanning Decl. Ex. 2. Anticipating "the upcoming expiration" of Proclamation 10014," the February 2021 guidance instructed the "[National Visa Center], KCC, and consular sections worldwide [to] begin scheduling . . . DV-2021 cases currently subject to [Proclamation] 10014 for appointments starting in April 2021." *Filazapovich*, 2021 WL 4127726, at *4. The guidance "incorporated the tiered prioritization framework announced in November 2020" and emphasized that "[visa-]processing posts should continue to maximize their resources to schedule as many family-based [visa] and fiancé [visa] appointments as possible, focusing on reducing any Immediate Relative (IR) visa backlog each month, as resources allow." *Id.* But posts with "immediate relative backlogs" were instructed to "schedule some . . . Diversity Visa (DV) cases each month considering the backlog, if any, for each type of case[.]" *Id.*

On February 24, 2021, President Joseph R. Biden issued Proclamation 10149, which revoked Proclamation 10014 and the portions of Proclamations 10052 and 10131 that had extended the "entry ban" to diversity visa holders. *See* 86 Fed. Reg. 11,847 (Feb. 24, 2021).

As of June *2020*, KCC had begun "processing DV-2021 cases by opening and reviewing application packets for DV-2021 cases." Miles Decl. ¶ 8. Since then, KCC has been engaged in DV-2021 application processing "without regard to any Presidential Proclamations." *Id.* From March 1, 2021 through September 21, 2021, consular officers adjudicated 15,3481 DV-2021 applications. Defs.' Opp'n Ex. C, Declaration of Brenda L. Grewe ("Grewe Decl.") ¶ 4, ECF No. 12-4. As of September 17, 2021, KCC had scheduled "at least 10,439 interviews, comprised of 21,092 applicants." Miles Decl. ¶ 13.

Defendants' processing of diversity visa petitions during the 2020 and 2021 fiscal years has been the subject of extensive litigation in this jurisdiction.  Pertinent to DV-2021 selectees, on September 9, 2021, Judge Amit Mehta granted DV-2021 selectees a preliminary injunction, ordering the Department of State to "undertake good-faith efforts . . . to expeditiously process and adjudicate DV-2021 applications and derivative beneficiary applications by September 30, 2021." *Filazapovich*, 2021 WL 4127726, at *26.

## C.  Factual Background

Plaintiff Satoshi Nishihata is a Japanese national and a selectee in the 2021 Diversity Visa Lottery.   Compl. ¶ 25. Plaintiff Ayaka Nishihata is Plaintiff Satoshi Nishihata's derivative beneficiary. *Id.*  Plaintiff Satoshi Nishihata's case is "not yet documentarily qualified."  Miles Decl. ¶ 20.  His visa number became "current" on June 1, 2021.  *Id.* ¶ 17.  As of September 24, 2021, Plaintiff Satoshi Nishihata's case is one of approximately 138 unscheduled DV-2021 cases, representing 252 applicants assigned to Tokyo for processing.  *Id.* ¶ 18.  As of that same date, the Tokyo post has "scheduled all documentarily qualified cases" for interviews.  *Id.*  ¶ 19.  There are 29 cases representing 62 DV-2021 applicants whose visa petitions are in the document review process, and who have a lower rank number than Plaintiffs.  *Id.* ¶ 21.

Plaintiffs filed their Complaint in this action on August 13, 2021.  *See* Compl.  In their Complaint, Plaintiffs allege that Defendants have unlawfully withheld and unreasonably delayed adjudication of their visas under the Mandamus Act, 28 U.S.C. § 1361, and the Administrative Procedure Act ("APA"), 5 U.S.C. § 555(b).  *Id.* ¶¶ 27–44.  Plaintiffs seek an order compelling Defendants to "schedule and complete Plaintiffs' diversity visa interviews, and adjudicate their [diversity visa applications], without further delay.  *Id.* at 13 ¶ (1).

On September 27, 2021, Plaintiffs filed a [9] Motion for Temporary Restraining Order ("TRO Motion"), in which they "request that the current status quo and their rights be preserved pursuant to APA § 705," and that the Court order Defendants to "reserve two (2) 2021 Diversity Visa program visa numbers for them throughout the pendency of this litigation"—in other words, past the fiscal year deadline.  Pls.' TRO Mot. at 9. Plaintiffs contends that absent this relief, they "will be unable to immigrate to the [United States] via the DV-2021 program."  *Id.* at 8.

The Court set a briefing schedule on Plaintiffs' TRO Motion during a teleconference with the parties on September 28, 2021.  *See* Minute Order (Sept. 28, 2021).  Later that day, Defendants filed their consolidated opposition and motion to dismiss Plaintiff's Complaint, addressing all issues except the availability of relief under APA § 705.  Defendants filed a supplemental response addressing that same issue on September 29, 2021 and Plaintiffs filed their reply in support of their TRO Motion on September 29, 2021.[4]

## II.    LEGAL STANDARD

### A.  Motion for Temporary Restraining Order

A temporary restraining order "is an extraordinary remedy that should be granted only when the party seeking the relief, by a clear showing, carries the burden of persuasion." *Postal Police Officers Ass'n v. United States Postal Serv.*, 502 F. Supp. 3d 411, 418 (D.D.C. 2020) (quoting *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004)).  An application for a TRO is analyzed using the same factors applicable to a request for preliminary injunctive relief. *See, e.g.*, *Gordon v. Holder*, 632 F.3d 722, 723–24 (D.C. Cir. 2011) (applying preliminary injunction standard to district court decision denying motion for TRO and preliminary injunction); *Sibley v.*

---

[4] Plaintiffs did not address Defendants' Motion to Dismiss, nor did they request to hold that motion in abeyance pending additional briefing.  Accordingly, as set forth in the accompanying Order, the Court shall require Plaintiffs to file a notice indicating whether or not they intend to oppose Defendants' Motion to Dismiss.

*Obama*, 810 F. Supp. 2d 309, 310 (D.D.C. 2011) (articulating TRO elements based on preliminary injunction case law).

Preliminary injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)); *see also Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) ("[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." (internal quotation marks omitted)). A plaintiff seeking preliminary injunctive relief "must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014) (quoting *Sherley*, 644 F.3d at 392 (internal quotation marks omitted)). When seeking such relief, "the movant has the burden to show that all four factors, taken together, weigh in favor of the injunction." *Abdullah v. Obama*, 753 F.3d 193, 197 (D.C. Cir. 2014) (quoting *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1292 (D.C. Cir. 2009)) (internal quotation marks omitted). "The four factors have typically been evaluated on a 'sliding scale.'" *Davis*, 571 F.3d at 1291. Under this sliding-scale framework, "[i]f the movant makes an unusually strong showing on one of the factors, then it does not necessarily have to make as strong a showing on another factor." *Id.* at 1291–92.

It is unclear whether the United States Court of Appeals for the District of Columbia Circuit's ("D.C. Circuit") sliding-scale approach to assessing the four preliminary injunction factors survives the Supreme Court's decision in *Winter*. *See Save Jobs USA v. U.S. Dep't of Homeland Sec.*, 105 F. Supp. 3d 108, 112 (D.D.C. 2015). Several judges on the D.C. Circuit have

"read *Winter* at least to suggest if not to hold 'that a likelihood of success is an independent, free-standing requirement for a preliminary injunction.'" *Sherley*, 644 F.3d at 393 (quoting *Davis*, 571 F.3d at 1296 (Kavanaugh, J., concurring)). However, the D.C. Circuit has yet to hold definitively that *Winter* has displaced the sliding-scale analysis. *See id.*; *see also Save Jobs USA*, 105 F. Supp. 3d at 112. In light of this ambiguity, the Court shall consider each of the preliminary injunction factors and shall only evaluate the proper weight to accord the likelihood of success if the Court finds that its relative weight would affect the outcome.

## B. 5 U.S.C. § 705

Section 705 of the APA provides that when "an agency finds that justice so requires, it may postpone the effective date of action taken by it, pending judicial review. On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court . . . may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve the status quo or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. "Requests for preliminary relief under the APA, 5 U.S.C. § 705, are also governed by the same standards" as motions for temporary restraining orders and preliminary injunctions. *Gomez I*, 485 F. Supp. 3d at 168.

## III.    DISCUSSION

For the reasons set forth below, the Court concludes that Plaintiffs have not carried their burden of demonstrating a likelihood of success on the merits, a certainty of irreparable harm, or that the balance of the equities and the public interest tilt in her favor. Accordingly, the Court will **DENY** Plaintiffs' TRO Motion.

### A.  Applicability of Section 705

Before proceeding with its inquiry into the four factors necessary to obtain a TRO, the Court addresses the parties' arguments regarding whether 5 U.S.C. § 705 authorizes the relief sought by Plaintiffs—to reserve two visas beyond the September 30, 2021 deadline.  Plaintiffs contend that a court order requiring Defendants to "reserve" two diversity visas is necessary to preserve "the current status quo" and "their rights."  Pls.' Reply at 9.

In two recent decisions in this jurisdiction, courts have noted that § 705 not only authorizes courts to "stay [agency] action pending judicial review," but also includes "the power to compel agency inaction when necessary to preserve the status quo or rights pending conclusion of the action.'" *Rai v. Biden*, Civil Action No. 21-cv-863-TSC, 2021 WL 4439074, at *15 (D.D.C. Sept. 24, 2021) (internal quotation marks and citations omitted); *Gomez I*, 485 F. Supp. 3d at 203.[5]

But several key distinctions differentiate this case from *Gomez* and *Rai*.  First, the plaintiffs in those case challenged the overarching Executive *policies* that halted diversity visa processing for certain time periods during the 2020 and 2021 fiscal years (the so-called "No-Visa Policy"). Plaintiffs here make no such challenge in their Complaint or TRO Motion,[6] but instead focus on Defendants' alleged inaction with respect to their individual visa applications.  This makes a difference because, in granting plaintiffs' request to reserve visas in both cases, the courts noted that they had "found that Defendants violated Congress's design when they nearly extinguished the . . . diversity visa program through their No-Visa Policy."  *Gomez II*, 490 F. Supp. 3d at 286

---

[5] In the order requiring Defendants to reserve visas beyond the September 30, 2021, the court in *Gomez* did not cite § 705 as the source of its authority to do so.  Rather, the court indicated that it "plainly has the *equitable authority* and discretion to order Defendants to reserve visas for future processing pending a final resolution of the merits."  *Gomez v. Trump ("Gomez II")*, 490 F. Supp. 3d 276, 286 (D.D.C. 2020).

[6] At least two courts in this jurisdiction have concluded that plaintiffs challenging the "lingering effects" of the policies suspending diversity visa adjudication at the beginning of the 2021 fiscal year *after* processing had resumed lack standing to challenge those policies. *See Gjoci*, 2021 WL 3912143, at *12–13; Mem. Op. at 13, ECF No. 23, *Gorgadze v. Blinken*, Civil Action No. 21-2421 (JDB)  (D.D.C. Sept. 29, 2021).

(citing *Gomez I*, 485 F. Supp. 3d at 196-97); *see also Rai*, 2021 WL 4439074, at *8–9.  That is, those courts granted relief, in part, based on a policy pursuant to which *no* visas were being processed.  Although Plaintiffs, in their Reply, attempt to invoke these policies as the basis for granting the relief they request under § 705, *see* Pls.' Reply at 2, 8, they did not raise any challenge to these policies in their Complaint or TRO Motion, and therefore the Court shall not consider them as a basis for granting relief.

Moreover, the Court is not persuaded that the relief requested by Plaintiffs would "preserve the status quo" or Plaintiffs' "rights."  *See* § 705.  Plaintiffs contend that the "status quo" is that they "have complied with all requests from the [Department of State] and are waiting for their DV visa interview.  They are 'qualified' to be interviewed based on their selection in the DV 2021 lottery and but for the delay on the part of the Defendants, they would be qualified for that interview and to be considered for the issuance of an immigrant visa."  Pls.' Reply at 3.  Notably Plaintiffs do not use the phrase "documentarily qualified," which describes visa applicants whose application materials have completed processing by KCC.  *See supra* Section I(A).  Rather, Defendants indicate in a sworn declaration that Plaintiffs are *not* "documentarily qualified" and Plaintiffs do not appear to dispute this point.  Accordingly, the "status quo" is that Plaintiffs are not presently in a position to receive a diversity visa because they are not "documentarily qualified" and have not been interviewed.  An order compelling Defendants to reserve visas to allow their applications to be adjudicated beyond the statutory deadline, therefore, would not *maintain* the status quo, but would instead alter it.

Plaintiffs' argument for equitable relief also relies on the flawed premise that they have a "right" to a visa by virtue of being selected in the DV-2021 lottery.  But that is not the case.

Plaintiffs received the opportunity to *apply* for a visa, not a *right* to receive one.  Accordingly, it is unclear to the Court what "rights" Plaintiffs can preserve through the relief they propose.

The Court is not persuaded that § 705 provides the authority for the Court to order the relief Plaintiffs seek here.  But even if it does, for the reasons below, Plaintiffs fail to carry their burden to demonstrate their entitlement to injunctive relief.  *Gomez I*, 485 F. Supp. 3d at 168 ("Requests for preliminary relief under the APA, 5 U.S.C. § 705, are also governed by the same standards" as motions for temporary restraining orders and preliminary injunctions).

**B.  Likelihood of Success on the Merits**

First, in order to receive a TRO or to stay agency action, the moving "party must show, among other things, 'a substantial likelihood of success on the merits.'"  *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015) (quoting *Mills v. District of Columbia*, 571 F.3d 1304, 1308 (D.C. Cir. 2009)).  The D.C. Circuit has identified a "likelihood of success on the merits" as the "most important factor" for courts to consider when contemplating a motion for preliminary injunctive relief.  *Aamer*, 742 F.3d at 1038.  Plaintiffs argue that they are likely to succeed on "their Mandamus and/or APA claims" that Defendants "have a clear and non-discretionary duty to adjudicate their DV visa applications."  Pls.' TRO Mem. at 5.[7]   For the reasons set forth below, the Court concludes that Plaintiffs have failed to demonstrate a substantial likelihood of success as to these claims.

The APA authorizes courts to "compel agency action unlawfully withheld[.]" *Id.* § 706(1).  Section 706(1) "empowers a court to compel an agency to perform a ministerial or non-discretionary act, or to take action upon a matter, without directing *how* it shall act."  *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 62 (2004) (internal citations and quotation marks omitted).

---

[7] In their Complaint, Plaintiffs also assert a claim for unreasonable delay under APA § 706(1), but they do *not* raise that claim in their TRO motion, and so the Court does not address it here.

Similarly, mandamus relief cannot be used to "compel or control a duty in the discharge of which by law [a federal officer] is given discretion" and is only appropriate where the defendant official owes the petitioner a clear and nondiscretionary duty.  *Work v. United States ex rel. Rives*, 267 U.S. 175, 177–78 (1925); *see also Heckler v. Ringer,* 466 U.S. 602, 616 (1984).  Mandamus relief is a "drastic and extraordinary remedy" that is "only to be reserved for extraordinary situations." *Cheney v. U.S. Dist. Court for D.C.*, 542 U.S. 367, 380 (2004).

Defendants argue that Plaintiffs "cannot point to a nondiscretionary duty to act on [their] visa case[s] within a certain timeframe, and Plaintiff[s] ha[ve] no legal entitlement to the adjudication of [their] visa case[s] within a certain timeframe."  Defs.' Opp'n at 16 (citing *In re Cheney*, 406 F.3d 723, 729 (D.C. Cir. 2005) ("[I]f there is no clear and compelling duty under the statute as interpreted, the [Court] must dismiss the action.")).  In response, Plaintiffs cite a recent decision by the U.S. District Court for the Eastern District of California, in which the court concluded that "Plaintiffs are entitled to the opportunity to have their visa[s] adjudicated as prescribed by 8 U.S.C. § 1202(b)[.]"  Pls.' TRO Mot. at 6 (quoting *Kassem v, Blinken*, No. 1:21-cv-01400-DAD-HBK, 2021 U.S. Dist. LEXIS 183515, at *12 (E.D. Cal. Sept. 24, 2021).  Other courts in this jurisdiction have likewise concluded that  8 U.S.C. § 1202(b) "imposes a mandatory duty on consular officers to review and adjudicate immigrant visa applications."  Pls.' Reply at 4 (quoting *Filazapovich*, 2021 WL 4127726, *at 17); *see also  Rai*, 2021 WL 4439074, at *12.

Plaintiffs, however, miss an important distinction.  The court in *Filazapovich* held that 8 U.S.C. § 1202(b) "imposes a nondiscretionary duty on Defendants to adjudicate diversity visas[.]" But the plaintiffs in *Filazapovich* challenged not only Defendants' failure to adjudicate their individual visa petitions, but also the Executive policies writ large that halted all diversity visa

processing at the beginning of FY2021.[8]  Plaintiffs here makes no such challenge, and it is undisputed that Defendants resumed processing visa petitions *before* their visas became "current" as of June 1, 2021 and before Plaintiffs filed their Complaint in this action.

Moreover, the court in *Filazapovich* did not conclude that any particular visa applicant has the right to have his or her diversity visa adjudicated before September 30.  *Filazapovich* 2021 WL 4127726, at *24 ("[I]t is true that Plaintiffs are not guaranteed to have their diversity visa applications adjudicated.").  Plaintiffs cite no authority supporting their contention that Defendants have a non-discretionary, mandatory duty to complete adjudication of *their* visas within a particular timeframe

Plaintiffs have failed to demonstrate a likelihood of success on the merits of her claim that Defendants have unreasonably withheld a mandatory, non-discretionary duty with respect to their visa petitions.

## C.  Irreparable Harm

The Court next considers whether Plaintiffs have demonstrated "irreparable harm." *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995).  To constitute "irreparable harm," the injury alleged must be "both certain and great, actual and not theoretical, beyond remediation, and of such imminence that there is a clear and present need for equitable relief."  *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015) (quotation omitted).  And "[p]laintiffs seeking preliminary relief [must] demonstrate that irreparable injury is *likely* in the absence of an injunction."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (emphasis in original) (internal citations omitted).   "[P]ossibility of irreparable harm" is not

---

[8] The same is true of the plaintiffs in *Rai*. In that case, the court granted preliminary injunctive relief to plaintiffs who claimed, in part, that the "regional No-Visa Policy violates the APA because it is contrary to law, in excess of statutory authority, arbitrary, capricious." 2021 WL 4439074, at *16.  Again, Plaintiffs in this case make no such challenge.

enough.  *Id.*  "[P]roving 'irreparable' injury is a considerable burden, requiring proof that the movant's injury is 'certain, great and actual—not theoretical—and imminent, creating a clear and present need for extraordinary equitable relief to prevent harm.'"  *Power Mobility Coal. v. Leavitt*, 404 F. Supp. 2d 190, 204 (D.D.C. 2005) (quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)).

Here, Plaintiffs argue that "[w]ithout an order from this Court compelling Defendants to either complete the processing of these two (2) visa applications or to reserve two (2) DV2021 visa numbers for them, Plaintiffs will be unable to immigrate to the [United States] via the DV2021 program."  Pls.' TRO Mot. at 8.  Other courts in this jurisdiction  have concluded that the loss of the "'opportunity to immigrate to the United States through the diversity visa program' constitutes an irreparable injury."  *Filazapovich*, 2021 WL 4127726, at *24 (quoting *Gomez I*, 485 F. Supp. 3d at 200);  *see also P.K. v. Tillerson*, 302 F. Supp. 3d 1, 10 (D.D.C. 2017) (granting injunctive relief considering "the potential irreparable harm" of not having their visas adjudicated).

The Court notes, however, that being selected in the diversity visa lottery and submitting required documents does not guarantee applicants a visa.  Rather, Plaintiffs were guaranteed the opportunity to *apply* for one of approximately 55,000 available visas—as were the other 71,817 lottery selectees for fiscal year 2021.  Another court in this jurisdiction recently concluded that this practical reality weighed *against* a finding of irreparable harm.  *See Serokova v. Biden, et al.*, CV Action No. 1:21-2066-TMF (D.D.C.), Tr. of Prelim. Inj. Hr'g (Sept. 24, 2021) at 37:15-20 ("[Plaintiff is] not claiming she's entitled to a visa.  She's claiming she's entitled to a visa adjudication.  It's not clear to me how failing to get a visa adjudication is a certain irreparable injury here.").  Plaintiffs have not carried their burden to demonstrate an irreparable injury because they are not necessarily entitled to diversity visas—even if the Court were to reserve them.

## D.  Balance of Harms and Public Interest

"The final two factors the Court must consider when deciding whether to grant a [temporary restraining order] are the balance of harms and the public interest."  *Sierra Club v. United States Army Corps of Engineers*, 990 F. Supp. 2d 9, 41 (D.D.C. 2013).  Where, as here, the government is a party to the litigation, these two factors merge and are "one and the same, because the government's interest is the public interest."  *Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016).  "Although allowing challenged conduct to persist certainly may be harmful to a plaintiff and the public, harm can also flow from enjoining an activity, and the public may benefit most from permitting it to continue."  *Sierra Club*, 990 F. Supp. 2d at 41.  Therefore, when "balanc[ing] the competing claims of injury," the Court must "consider the effect on each party of the granting or withholding of the requested relief."  *Winter*, 555 U.S. at 24.

Plaintiffs argue that the requested restraining order "would impose no injury on the government or the public[.]" Pls.' TRO Mot. at 8.  Rather, Plaintiffs' arguments with respect to these TRO factors rely on the rationale that they are "merely moving for an injunction against practices that [other courts] already found unlawful" and are "not seeking a remedy not yet granted to others, but an injunction holding that [they] are equal under the law to those already benefited by these district court rulings."  *Id.*  Plaintiffs fail to recognize, however, that those remedies were granted in cases presenting distinct claims (including claims against the No-Visa Policy, which Plaintiffs do not assert here), and in varying procedural postures.  In *Rai*, unlike here, for example, all plaintiffs were "documentarily qualified" and merely awaiting an interview.  *Rai*, 2021 WL 4439074, at *2.

17

Moreover, the Court cannot ignore that the practical effect of granting Plaintiffs' requested relief would allow Plaintiffs to proceed to the front of the queue of other similarly-situated diversity visa applicants—who are eligible for a DV-2021 visa, but have not yet received one.  *See Verma v. USCIS*, Civil Action No. 20-3419 (RDM), 2020 WL 7495286, at *9 (D.D.C. Dec. 18, 2020) ("To grant Plaintiff priority would push those individuals further back in line when the only difference between them is that plaintiff has brought a federal lawsuit." (internal quotation marks and citations omitted)).  Permitting review of Plaintiffs' applications after the September 30, 2021 deadline would "merely direct government resources" from the adjudication of other visa applications," *Ghadami v. Dep't of Homeland Sec.*, No. 19-00397, 2020 WL 1308376, at *9 (D.D.C. Mar. 19, 2020), interfering with the agency's "unique—and authoritative—position to view its projects as a whole, estimate the prospects for each, and allocate its resources in the optimal way."[9]  *In re Barr Laboratories, Inc.*, 930 F.2d 72, 75 (D.C. Cir. 1991).

Overall, the Court finds that Plaintiffs have not demonstrated that the balance of the harms and the public interest weigh in favor of their requested TRO.

## IV.   CONCLUSION

For the reasons set forth in this Memorandum Opinion, the Court concludes that Plaintiffs have failed to satisfy their burden of demonstrating a likelihood of success on the merits, a certainty of irreparable harm, or that the balance of hardships and the public interest weigh in their favor.  Accordingly, the Court will **DENY** Plaintiffs' [9] Emergency Motion for a Temporary Restraining Order.  An appropriate Order accompanies this Memorandum Opinion.

**Dated**: September 30, 2021

/s/
COLLEEN KOLLAR-KOTELLY
United States District Judge

---

[9] It is unclear from the present record, for example, whether holding over visas beyond the fiscal year deadline for DV-2021 applicants would affect processing DV-2022 applications.